**STATE, Plaintiff-Appellee, v. REED, Defendant-Appellant.**

Ohio Appeals, Eighth District, Cuyahoga County.

No. 21217.   Decided December 20, 1948.

Frank T. Cullitan, County Prosecutor, Harvey G. Monck, Asst. Prosecutor, Cleveland, for plaintiff-appellee.

Sidney B. Fink, H. G. Holland, Cleveland, for defendant-appellant.

## OPINION

By HURD, PJ.

On February 6, 1948, at about 1:30 o'clock P. M., the defendant, Ralph Reed, together with three companions, Esson, LaDuca and Muncy attempted a payroll robbery at The Reliable Steel Plate Company located at 2330 East 79 Street, Cleveland, Ohio. The four had previously met at Room 1 of the Netley Hotel in Cleveland, at approximately twelve o'clock. There they planned the robbery. They left the hotel room some time between 12:30 and 1:00 o'clock P. M., and first drove past the scene of the crime.

Upon their return, Reed, together with Esson and LaDuca, entered the offices of the company and Muncy remained in the car outside. Reed entered the office first. All three were masked and Reed and LaDuca had loaded guns. Three women employees were in the office at the time. The three defendants forced the women employees into a washroom. Esson remained in the washroom and stood guard over them. After some twenty minutes elapsed and while the conspirators were waiting for the payroll to be returned from the bank by the bookkeeper of the company, the owners of the com-

pany, Mr. Emanuel Margulis and his son, George Margulis, returned to the office from lunch. Immediately Reed and LaDuca, at the point of guns, demanded the payroll from them, and when informed that they did not have the payroll, LaDuca, with a gun pressed to the stomach of the elder Margulis, demanded their wallets. The father turned his wallet over to LaDuca. Reed held a gun to the back of the son, George Margulis, and while he held his gun on the son the telephone bell rang and one of the girls went to answer the telephone. At the same time as the son started to lower his hands to turn his wallet over to Reed, Reed shot him in the back. The wounded man was taken to a hospital where he died about a half hour later. The defendants then took the contents of the petty cash box in the company's office and started to leave. Reed, after having fired the shot into the back of George Margulis turned his gun on the father of the victim and the other employees and told them not to move and the men ran out of the place. They escaped in the car in which Muncy was sitting.

By a peculiar coincidence, it happened that two employees of the telephone company were working as installers on a pole on Lucille Avenue near the scene of the robbery. They observed the robbers' car as it swerved around the corner. They noticed that the man next to the driver was masked and was holding a gun and that there were two occupants in the back seat of the car. The telephone men immediately cut in on a line and called the police, giving them a description of the car. The police arrived shortly thereafter and searched the area. They observed a car answering the description going north on East 82nd Street and they gave chase. Being spotted by the police the get-away car was pulled to the curb in front of 8113 Linwood Avenue and the occupants took to flight on foot.

Later LaDuca was observed walking on Linwood Avenue. He was arrested and searched and $55.00 was found in his pocket which he admitted was the money he had taken from the wallet of the senior Margulis. Other police officers searching the vicinity observed the head of a man projecting from the northwest corner of a building at 8113 Corey Avenue. The police ran around the building and came upon a man standing with a loaded gun in his hand and confronting a woman. The police disarmed him and found upon his person some papers belonging to the Reliable Steel Plate Company. This man was James Esson. As Esson was being searched for more weapons, he told the police that he had a toy pistol at the time of the stick-up and had disposed of it in a yard at the

south side of Corey Avenue in the rear of one of the garages. The police proceeded to the garage and were apprised by citizens that another man had gone into the garage. In the garage the police found Edsel Muncy, the driver of the automobile in which the men made their get-away. The police then proceeded to the Netley Hotel at 8803 Euclid Avenue where Sam LaDuca had a room. There they apprehended defendant, Reed, in the hallway of the hotel. Reed told the police that he was a room-mate of LaDuca and took them to the room that he and LaDuca had occupied. Reed had in his pocket a handkerchief folded in a triangular fashion. He told the police where he had thrown the gun he had used in the robbery as well as another handkerchief mask used in the robbery. Reed's gun a nickleplated Colt automatic was found in a basement window well at 8119 Linwood Avenue. There was a bullet in the firing chamber and five in a clip. In searching LaDuca's room the police found 14 bullets on the floor of the clothes closet which defendant Reed admitted belonged to him.

When the four men were brought in for questioning they all made and signed written statements admitting their part in the crime.

On Feb. 24, 1948, defendant Reed was indicted jointly with James Esson, Sam LaDuca and Edsel Muncy on two counts charging the defendants with murder in the first degree for the killing of George Margulis.

The first count charged as follows:

"Do Find and Present that Ralph Reed, James R. Esson, Sam LaDuca and Edsel Ford Muncy, on or about the 6th day of February, 1948, at the county aforesaid, unlawfully, purposely and while in the perpetration of robbery, killed George Margulis contrary to the form of the statute in such case * * *."

The second count charged murder in the first degree with deliberate and premeditated malice.

The defendant, Reed, was tried separately to a court and jury. The jury returned a verdict of guilty as charged in the first count in the indictment without a recommendation of mercy. The defendant was sentenced to death in the electric chair on Sept. 23, 1948. A motion for new trial having been overruled, error was prosecuted to this court where a stay of execution was granted pending appeal.

It was admitted by the defendant on the stand as well as in a statement which he gave to the police, that he fired the shot which killed Margulis, in the course of the robbery. Defendant claimed, however, that the shooting was accidental

and that he did not purposely kill the deceased. The record shows that both Reed and LaDuca had criminal records and had become acquainted while serving time in the Mansfield Reformatory.

There are ten assignments of error which for purposes of discussion can be consolidated and reduced to three. (1) Error of the court in charging on the subject of Confessions; (2) Error of the court in the admission of certain evidence alleged to be prejudicial to the rights of defendant; (3) that the verdict is manifestly against the weight of the evidence.

We will consider first the error claimed in the charge of the court on the subpect of Confessions. The complaint is made that the statement of the defendant admitted in evidence and to which the court referred was not a confession and that therefore it was error for the court to charge the jury on this subject. We think this contention is untenable. A reading of the defendant's signed statement voluntarily given to the police unmistakably shows that he participated in the planning of the robbery. The following excerpt from his statement supports this contention:

"The fellows started talking and I said 'I am not accustomed to this, I am a burglar, but I will do anything to get some money right away.' Bill said the place he had in mind was all right and the payroll would be waiting for us. He said there would be one man and two girls and they would give up the payrool without any argument."

His statement also shows active participation in the crime with a loaded gun, as instance the following excerpt:

"The second time we came back we entered the building. I went in first * * * I told the three girls to behave themselves and not say anything and nobody would be hurt. I said all we wanted was the payroll. We all had guns in our hands and we all had masks on, made out of a handkerchief. Bill told the girls to go in the back in the ladies washroom and we watched them and we waited. It seemed like a half hour to me. The two fellows that run the place came in and me and Sammy all stuck them up. I just said 'Put up your hands,' and they put them up and Sam LaDuca said to me 'you take care of this guy.' Then he started to search the other guy. The one he searched I think was the boss. I started to frisk the other one and he had his overcoat on and when I did that the gun went off and he just fell and I run."

Further on in the statement is the following:

"Q. What did you do with the automatic you had?

A. I threw it in like a cellar window place in a house.

Q. Showing you a 380 nickleplated Colt automatic with pearl handles, Serial No. 99280 with a nick out of the pearl on the back, is this your gun?

A. Yes sir.

Q. Is this the gun you had in your hand when it went off in the stick-up or robbery at this place on E. 79 St.?

A. Yes."

By way of defensive matter we find the following statement:

"Q. Is there anything else you want to tell us about this matter?

A. I didn't know the safety was off the gun and I didn't expect it to go off. I just tried to scare him. I didn't want to shoot him. That's all."

This statement was properly admitted in evidence in the trial of the case and the jury had it with them in their jury room. Of course the defendant didn't say in haeac verba "I purposefully shot the decedent." To the contrary, he denied a purposeful killing. In view of the contents of this statement we think it was not only proper but the duty of the court to charge on the proposition of law concerning confessions. Therefore we find no error in this respect.

The next claim of error which is argued seriously is in the admission of a statement by a co-defendant named Esson, made to the police while he was being taken to the police station. It appears that he was asked who his accomplices were. Referring to defendant, Reed, he said he was accompanied by another boy named "Red;" he did not know his first or his surname. The officer while testifying to this answered questions as follows:

"Q. Did he say how long he had known him?

A. He told us he had known him about three days.

Q. Yes?

A. At the same time Esson admonished us to be very careful when apprehending this Reed. Very dangerous."

When objection was made by counsel for defendant, the court inquired of officer Cavanaugh who was testifying as to whether or not this was part of the conversation, to which

the witness answered "Yes, Sir," and the court thereupon overruled the objection which had been made. This conversation took place about twenty minutes after the shooting and before Reed was apprehended about one-half hour after the shooting, at the Netley Hotel.

In view of these facts, it is the claim of the state that the statement made by Esson to officer Cavanaugh to be careful when apprehending Reed was therefore competent and admissible as part of the res gestae it being contended that evidence falls within the rule of res gestae where the words spoken are in such close connection with the acts done that they are part of them. It is also contended that the rule applies to words spoken by a participant in a crime. In support of this contention the state cites the cases of **State of Ohio v. Lasecki, 90 Oh St 10 (1914)** and **State v. Habig, 106 Oh St 151.**

We are not inclined to agree with the contention of the state on this subject of res gestae as applied to the statement of the co-conspirator in this case.

It is held in State v. Lasecki, supra, that the doctrine of res gestae as applied to exclamations should have its limits determined not by the strict meaning of the word "contemporaneously" but rather by the causal logical or psychological relation of such exclamation with the primary facts in controversy. In that case the exclamation of a boy four years of age that "the bums killed pa with a broomstick" was made from ten to thirty seconds after a fatal assault upon the father. Certainly there was also a logical and psychological relation with the primary fact in controversy, namely the crime charged.

In the Habig case the robbers were in flight carrying with them the proceeds of the robbery and it was held that the killing of a policeman in the course of their attempted escape was homicide committed in perpetration of robbery and was thus part of the res gestae.

In the present case there is presented a different set of facts. True, the statement was made about twenty minutes after the crime and also that the defendant Reed was still in flight or at least had not yet been apprehended. It is possible of course that the utterance of co-defendant Esson was made under the stress of what had just occurred, particularly the memory of seeing the deceased shot down in the course of the robbery. He may at that time have been obsessed with the thought that Reed was a dangerous man and under the impulse of the moment warned the officers to be careful. He might have feared there would be another killing. On the other hand, his statement may have been influenced by a thought of self-preservation. He may have had time to

reflect and was attempting to gain the good will of the officers by making this statement.

However, we find no causal, logical or psychological relation to the crime charged and the statement made. Neither do we consider that the statement made was so connected with the primary fact in issue as to form part of the same transaction or occurrence, nor does it tend to prove or disprove any fact in issue. Therefore we believe the statement should have been excluded as part of the res gestae.

This leaves for consideration the question of whether or not it affirmatively appears from the record that the defendant was or may have been prejudiced thereby. In this respect we must be governed by the provisions of §13449-5 GC, the pertinent part of which provides as follows:

"**Sec. 13449-5 GC:** When New Trial Shall Not Be Granted: No motion for new trial shall be granted or verdict set aside nor shall any judgment of conviction be reversed in any court * * * for the admission or rejection of any evidence offered against or for the accused unless it affirmatively appears on the record that the accused was or may have been prejudiced thereby."

It is our view that the statement volunteered by the co-defendant to the police officer was not prejudicial to the rights of defendant in this case.

We conclude from the entire record that defendant was not prevented by the admission of this testimony from having a fair trial.

There are two other instances in the record of which complaint is made, where testimony was admitted over the objections of the defendant. In each instance however the court instructed the jury to disregard the testimony of which complaint is made. We think the instructions of the court in this respect were definite and explicit and that therefore no prejudicial error resulted.

Finally, it is the contention of counsel for defendant, that the verdict in this case was manifestly against the weight of the evidence.

We cannot agree with this contention. As heretofore stated, the statement of the defendant himself indicates that he participated in the planning of the robbery and proceeded to the scene of the crime armed with a deadly weapon. Expert opinion evidence was introduced showing that a five pound weight was required to pull the trigger of the gun. In his statement to the police the defendant admitted that he was

a burglar but that he would do anything to get money right away. He also testified at pages 408-409 of the record that on leaving he pointed the loaded gun at the others and said 'please do not move.' The jury could well take into consideration all of these statements together with the evidence given by the defendant in exculpation of his acts by claiming that the shooting was accidental.

By way of brief, counsel for defendant state,

"The defendant, with three others, planned a robbery. During the robbery a shot fired from the gun held by the defendant killed a certain George Margullis. These facts were conceded and the case turns upon two propositions; first ·did the defendant purposely kill George Margulis; second, if he did, should the verdict of the jury have contained a recommendation of mercy?"

On the first proposition, the act of killing in the course of a robbery being conceded, an issue was made as to whether or not the killing was purposeful. No method has yet been found whereby the processes and workings of the human mind can be analyzed and measured to a degree of absolute certainty. Therefore, it is necessary to determine purpose and intent from acts and conduct. That a person is presumed to intend the natural and probable consequences of his voluntary act is too axiomatic to require discussion here.

The jury could very well consider that when defendant with others planned the robbery and took with him a loaded gun for the execution of such a crime of violence that he may even at that moment have formed a purpose or intention to kill if necessary in the accomplishment of his objective.

On the whole case, a question of fact was presented for the jury to determine the guilt or innocence of the defendant of the crime charged, the state having the burden of proving guilt by evidence beyond a reasonable doubt. The members of the jury are the sole judges of the facts, the weight of the evidence and the credibility of the witnesses and having determined the issue as shown by their verdict, we cannot say that it is contrary to the manifest weight of the evidence.

On the second proposition, the defense argues that the jury should have granted mercy, that in effect there should not have been a "chair verdict" in this case.

In respect of this proposition, we must point out that this is a matter exclusively within the province of the jury, and this court is without jurisdiction to interfere by way of modification or reversal.

248

It is our conclusion that from all the evidence and under the provisions of §13449-5 GC, the judgment of the common pleas court should not be modified or reversed by this court.

The judgment therefore is affirmed. Exc.

MORGAN, J, SKEEL, J, concur.